1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA


EULOGIO MARTIN,

        Petitioner,

     v.                                                              No. C 05-3486 MHP

JOHN MARSHALL, Warden,                            **MEMORANDUM & ORDER**
                                                                        **Re: Petition for Writ of Habeas**
        Respondent.                                      **Corpus**

_____/

      Eulogio Martin, an inmate at the California Men's Colony in San Luis Obispo, California,
filed this action seeking a writ of habeas corpus pursuant to 28 U.S.C. section 2254. His petition is
now before the court for review pursuant to 28 U.S.C. section 2243 and Rule 4 of the Rules
Governing Section 2254 Cases. Having considered the arguments presented and for the reasons
stated below, the court enters the following memorandum and order.


BACKGROUND

      Petitioner was convicted of second-degree murder in connection with a shooting that took
place on November 15, 1979 in San Francisco.[1] The facts surrounding petitioner's crime are largely
undisputed, and are set forth in petitioner's Life Prisoner Evaluation (Pet.'s Exh. E). One of the
victims, Walter Acosta, had a prior relationship with petitioner relating to the sale of drugs. Acosta
was well known in his neighborhood as a drug dealer with a penchant for violence. Petitioner owed
Acosta money for drugs and for damage to a car petitioner had borrowed. Petitioner claims that
Acosta had threatened and harassed him in the weeks leading up to the shooting.

      On November 15, 1979, petitioner was sitting in a restaurant with two friends. Acosta
entered the restaurant and approached petitioner. Petitioner asked Acosta to leave, but Acosta
refused. Petitioner was convinced that Acosta had come to the restaurant to shoot him. Petitioner

UNITED STATES DISTRICT COURT
For the Northern District of California

1  had entered the restaurant unarmed, but one of his friends passed him a gun.  It was clear that Acosta

2  would not leave the restaurant, and when petitioner saw him reach into his pocket, petitioner began

3  to shoot at him.  He shot Acosta seven times, killing him immediately.  Petitioner claims he had lost

4  control of himself at this point, and continued shooting, hitting two innocent bystanders.  One

5  bystander died, while the other sustained a non-fatal shot to the foot.  A .39 caliber gun was found

6  on Acosta.

7        On February 22, 1980, petitioner was sentenced to a prison term of fifteen years-to-life, with

8  a five year enhancement.  Petitioner's fifth parole hearing took place on April 30, 2003.  At that

9  hearing, the Board of Prison Terms ("Board" or "BPT") concluded that petitioner was suitable for

10  parole.  The Board detailed its findings in its order.  See Pet.'s Exh. B, at 57–61.  The Board found

11  that petitioner had no juvenile criminal record.  Id. at 57.  Petitioner's only prior offense was a

12  charge of possession of a controlled substance in 1978, to which he pleaded no contest.  Pet. at 12.

13  He was placed on probation for this crime and was deported to Mexico.  Id.  The Board also found

14  that petitioner lacked a significant history of violent crime, and that he committed the instant offense

15  as a result of stress in his life.  Pet.'s Exh. B at 58.  Petitioner showed signs of remorse, understood

16  the nature and magnitude of the offense and accepted responsibility for his criminal behavior.  Id.

17  The record indicated that his last psychological evaluation, performed by Dr. Kate Burkham,

18  supported release.  Id. at 59.  Dr. Burkham had found that petitioner fell in the low-moderate range

19  for future offense within the community as long as he abstained from substance abuse and followed

20  through with his plans for parole.  Id.  The doctor also found petitioner a low-medium risk for future

21  violence.  Id.  Because of maturation, growth, a better understanding and advanced age, the Board

22  found that petitioner had a reduced possibility of recidivism.  Id. at 58.

23        The Board also outlined petitioner's accomplishments while in prison.  Id. at 57–58.

24  Petitioner participated in education programs, self-help and therapy, vocational programs,

25  institutional job assignments, and volunteer work.  Id.  Petitioner had been involved in Alcoholics

26  Anonymous and Narcotics Anonymous since 1990.  Id. at 59.  He participated in several courses,

27  including a marriage and family course, an anger management course, The Big Four Fellowship and

28

UNITED STATES DISTRICT COURT
For the Northern District of California

1   the Inmate Peer Education Program.  Id.  Petitioner also improved his marketable job skills while in

2   prison.  Id. at 57.  He earned a certificate in Vocational Sewing Machine Repair and completed a

3   Vocational Automachine Shop course.  Id.  Since February 2001, petitioner has worked in the Prison

4   Industry Authority shoe factory, earning above average to exceptional work reports.  Id. at 39, 57.

5       The Board found that petitioner had realistic parole plans in Jalisco, Mexico, including job

6   offers in his brother's auto shop and his sister's textile shop, and family support.  Id. at 58.  He

7   planned to live with his parents on their ranch.  Id.  The Board found these plans realistic due to an

8   INS hold indicating that petitioner would be deported to Mexico after release.  Id. at 36.

9       The Board's Decision Review Unit approved the grant of parole on September 2, 2003.

10  Governor Gray Davis reversed the grant of parole on September 24, 2003.[2]

11      In his review of petitioner's parole grant, Governor Davis cited several reasons for reversing

12  the Board's decision.  See Pet.'s Exh. D.  First, Governor Davis stressed the gravity of petitioner's

13  crime, highlighting the facts that petitioner continued to fire the gun after Acosta was dead and that

14  petitioner failed to call for help after committing the crime.  Governor Davis stated that petitioner's

15  crime demonstrated a "callous disregard for human life and a lack of remorse."  Second, Governor

16  Davis disagreed with the Board's finding that the crime was a result of stress in petitioner's life.

17  Governor Davis concluded that petitioner was responsible for his stress because he voluntarily

18  entered into a life of selling drugs and he failed to go to the police when Acosta threatened him.

19  Third, Governor Davis stated that petitioner's parole plans in Mexico were unrealistic.  The

20  Governor pointed out that petitioner has a history of entering the United States illegally.  Therefore,

21  the Governor concluded, petitioner should have viable parole plans in the United States as well as in

22  Mexico.

23      The Governor also relied on at least two facts that were not discussed in petitioner's April

24  30th hearing.  First, petitioner has received twenty disciplinary violations while in prison.  Ans. at 7.

25  The disciplinaries included "possession of drugs, weapons materials and gambling paraphernalia."

26  Pet.'s Exh. D at 3.  Since 1995, however, petitioner has not had a serious rules violation.  Ans. at 7.

27  Second, the Governor asserts that petitioner was stabbed three times between 1987 and 1990 as a

28

3

1   result of his involvement with loan sharks in prison.[3]  Id.  The Governor found that these two facts

2   belied the Board's finding that petitioner was suitable for parole based on positive institutional

3   behavior.

4       After the Governor reversed petitioner's parole grant, petitioner filed a petition for writ of

5   habeas corpus in the San Francisco Superior Court ("Superior Court").  The Superior Court denied

6   the petition.  The California Court of Appeal and the Supreme Court subsequently denied the

7   petition without comment.  After exhausting his state remedies, petitioner filed a petition for writ of

8   habeas corpus in this court.

9       Petitioner contends that there was no evidence to support the Governor's reversal of

10  petitioner's parole grant, and that petitioner was therefore denied due process of the law.

11

12  LEGAL STANDARD

13  I.      Liberty Interest in Parole

14      The Fifth and Fourteenth Amendments prohibit the government from depriving an inmate of

15  life, liberty, or property without due process of law.  U.S. CONST. amends. V, XIV.  In the parole

16  context, a violation of an inmate's due process occurs when (1) the inmate has been deprived of a

17  constitutionally protected liberty interest in parole, and (2) the inmate has been denied adequate

18  procedural protections in the parole process.  See, e.g., Biggs v. Terhune, 334 F.3d 910, 913 (9th

19  Cir. 2003).

20      There is no cognizable right to parole under the Federal Constitution.  The Supreme Court

21  has held, however, that when a state's parole statute uses mandatory language, the statute "creates a

22  presumption that parole release will be granted" unless certain findings are made, and thereby gives

23  rise to a constitutionally protected liberty interest.  Greenholtz v. Inmates of Nebraska Penal &

24  Correctional Complex, 442 U.S. 1, 7 (1979); Board of Pardons v. Allen, 482 U.S. 369, 377–78

25  (1987).  California Penal Code section 3041 states that "[t]he panel or board *shall* set a release date

26  *unless* it determines that" statutorily defined determinations are met.  Thus, under Greenholtz and

27

28

UNITED STATES DISTRICT COURT
For the Northern District of California

4

UNITED STATES DISTRICT COURT
For the Northern District of California

1  <u>Allen</u>, the Ninth Circuit found "that California's parole scheme gives rise to a cognizable liberty

2  interest in release on parole." <u>McQuillion v. Duncan</u>, 306 F.3d 895, 901 (9th Cir. 2002).

3        The second prong of the due process inquiry—whether the inmate has been afforded an

4  adequate parole process—is satisfied if two considerations are met.  First, the parole procedure itself

5  must provide an inmate with sufficient safeguards.  The inmate must be afforded an opportunity to

6  be heard before an unbiased decision-maker, and in the case of a denial of parole, must be informed

7  of the reasons underlying the decision.  <u>See</u> <u>Jancsek v. Oregon Bd. of Parole</u>, 833 F.2d 1389, 1390

8  (9th Cir. 1987).  Second, "some evidence" must support the decision to grant or deny parole.  <u>Id.</u>

9  (adopting the "some evidence" standard established by the Supreme Court in <u>Superintendent v. Hill</u>,

10 472 U.S. 445, 457 (1985)).  The evidence underlying the grant or denial of parole must have "some

11 indicia of reliability."  <u>Id.</u>  The "some evidence" standard applies equally to the Board's decision and

12 the Governor's review of the grant or denial of parole.  <u>See, e.g.</u>, <u>In re Rosenkrantz</u>, 29 Cal. 4th 616,

13 656, 660–61 (2003).  The Governor is not limited to considering the same factors considered by the

14 Board.  <u>Id.</u> at 677.

15       However, the deferential "some evidence" standard has outer limits.  <u>See</u> <u>Coleman v. Board</u>

16 <u>of Prison Terms</u>, No. 96-0783 LKK PAN, slip op. at 9 (E.D. Cal. May 19, 2005).  If it is established

17 that a particular judgment was predetermined, then a prisoner's due process rights will have been

18 violated even if there is "some evidence" to support the decision.  <u>See</u> <u>Bakalis v. Golembeski</u>, 35

19 F.3d 318, 326 (7th Cir. 1994) (a decision-making "body that has prejudged the outcome cannot

20 render a decision that comports with due process."); <u>see also</u>, <u>In re Rosenkrantz</u>, 29 Cal. 4th at 677

21 (a parole decision "must reflect an individualized consideration of the specified criteria and cannot

22 be arbitrary and capricious.").  The California Supreme Court has explicitly stated that a blanket no-

23 parole policy as to a certain category of prisoners is illegal.  <u>See</u> <u>In re Minnis</u>, 7 Cal. 3d 639 (1972);

24 <u>see also</u> <u>In re Morrall</u>, 102 Cal. App. 4th 280 (2003).

25

26

27

28

5

1    II.    Habeas Corpus

2         The court is required to analyze state habeas claims under the Antiterrorism and Effective

3    Death Penalty Act of 1996 ("AEDPA").  AEDPA provides that an

4         application for a writ of habeas corpus on behalf of a person in custody pursuant to
          the judgment of a State court shall not be granted with respect to any claim that was
5         adjudicated on the merits in State court proceedings unless the adjudication of the
          claim resulted in a decision that was contrary to, or involved an unreasonable
6         application of, clearly established Federal law, as determined by the Supreme Court
          of the United States.
7
     28 U.S.C. § 2254(d)(1).  Although petitioner is "a person in custody pursuant to the judgment of a
8
     State court," it is unsettled in the Ninth Circuit whether the state courts' review of the Governor's
9
     parole decision is a "state court proceeding" as contemplated by AEDPA.  See McQuillion, 306 F.3d
10
     at 901.  Petitioner is not challenging the state trial court's handling of his trial.  "Nonetheless, it is
11
     possible that, because his claim of a due process violation by the state parole authority was heard by
12
     state courts on collateral review, that claim has been 'adjudicated on the merits in [a] State court
13
     proceeding' within the meaning of AEDPA."  Id.  (alteration in original).
14
          Accordingly, this court will review the last reasoned state court opinion under the standards
15
     outlined in AEDPA.  See Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991).  The Supreme Court has
16
     interpreted AEDPA to require a district court to uphold the state court's decision unless that decision
17
     was an "objectively unreasonable" application of a clearly established federal law.  Lockyer v.
18
     Andrade, 538 U.S. 63, 75 (2003).  Here, the last reasoned state court opinion occurred in the
19
     Superior Court for the County of San Francisco.  Thus, this court will apply the deferential AEDPA
20
     standard to the Superior Court proceeding to determine whether it was "objectively unreasonable" to
21
     find the denial of petitioner's parole to be supported by some evidence.
22

23   DISCUSSION

24        Petitioner argues that the state court erred in its analysis of the factors underlying the

25   Governor's decision to reverse petitioner's parole grant, and that there was no evidence warranting

26   the Governor's reversal.  Petitioner also notes that another district court has granted relief based on

27

28

                                                      6

UNITED STATES DISTRICT COURT
For the Northern District of California

1    the finding that the Governor operated under a blanket no-parole policy for prisoners convicted of

2    murder, and that this may provide an explanation for the Governor's reversal here.

3        Respondent argues that this court must uphold the Superior Court's decision because that

4    court did not err in finding that there was some evidence to support the Governor's decision to

5    reverse the grant of parole.

6

7    I.    Due Process Violation

8        A.    Liberty Interest in Parole

9        Respondent asserts that a recent California Supreme Court decision, In re Dannenberg, 34

10   Cal. 4th 1061 (2005), abrogated California's state-created liberty interest in parole.  Respondent's

11   argument depends on a single decision from the Eastern District of California, Sass v. Board of

12   Prison Terms, 376 F. Supp. 2d 975 (E.D. Cal. 2005).  The Northern District has expressly declined

13   to follow Sass, reaffirming that California law recognizes a liberty interest in parole.  Lewis v. Solis,

14   No. 04-2152 JF, 2005 WL 3454137, at *3–*4 (N.D. Cal. Dec. 14, 2005) (Fogel, J.).

15       Indeed, all subsequent decisions have rejected Sass.  See, e.g., Coleman, No. 96-0783 LKK

16   PAN (finding that there is a liberty interest under California's parole scheme (citing McQuillion,

17   306 F.3d 895, Greenholtz, 442 U.S. 1, Biggs, 334 F.3d 910, and In re Rosenkrantz, 29 Cal. 4th

18   616)); Saif'ullah v. Carey, No. C 02-2664 MCE, 2005 WL 1555389 *9 (E.D. Cal. June 28, 2005)

19   (citing Biggs for the proposition that there is a liberty interest in parole); Devries v. Schwarzenegger,

20   No. C 05-0235, 2005 WL 2175875 (E.D. Cal. Sept. 8, 2005), as amended, 2005 WL 2604203, *3–*4

21   (E.D. Cal. Oct. 13, 2005) (concluding that Dannenberg found there was no liberty interest in a

22   uniform parole date, which is different from holding that the parole scheme as a whole does not

23   create a conditional liberty interest); Clay v. Kane, No. 04-8663, slip op. at 18 (C.D. Cal. Dec. 21,

24   2005) ("The [Dannenberg] court did not hold that there is no protected liberty interest in parole

25   whatsoever.  It simply held that the BPT was not required to compare one inmate's parole suitability

26   with the parole suitability determinations given to other inmates who had been convicted of similar

27   crimes . . . .  California courts continue to analyze claims regarding denial of parole under the Due

28

7

1    Process Clause, even after <u>Dannenberg</u>.").  The court therefore finds that California Penal Code

2    section 3041 continues to establish a liberty interest in parole.

3

4              B.        Compliance with the "Some Evidence" Standard

5         Petitioner contends that there was no evidentiary basis for the Governor's reversal of the

6    parole grant.  Respondent argues that the Governor identified specific evidence in support of several

7    parole suitability factors, which satisfies the "some evidence" standard.  Respondent stresses that the

8    Governor may independently review the evidence that was before the Board, and has wide discretion

9    to come to a different conclusion on parole suitability based on that evidence.

10        Section 2402 of Title 15 of the California Code of Regulations ("section 2402") sets forth a

11   non-exhaustive list of factors to consider when determining an inmate's suitability or unsuitability

12   for parole.

13        Subsection (c) of section 2402 enumerates six factors that tend to show unsuitability for

14   parole.  The Governor found that the Board placed insufficient weight on three of the six factors:

15   (1) the seriousness of the crime; (2) the extent to which the nature of the crime showed a callous

16   disregard for human life; and (3) the disciplinary violations during the period prior to 1995, eight

17   years before the parole hearing.  <u>See</u> § 2402(c)(1)(A), (c)(1)(D) and (c)(6).

18        Subsection (d) of section 2402 sets forth nine factors tending to demonstrate a prisoner's

19   suitability for parole.  The Governor made three findings under subsection (d): (1) the commission

20   of the crime showed a lack of remorse because petitioner fled the scene without securing medical

21   help; (2) life stress should not be considered because any stress petitioner experienced was due to his

22   own fault; and (3) petitioner lacks viable parole plans.  <u>See</u> § 2402(d)(3), (d)(4), and (d)(8).

23        The Superior Court found no evidence to support the Governor's conclusions with respect to

24   the unsuitability factors, a conclusion which this court finds to be reasonable.  The record indicates

25   that petitioner committed the crime, at least in part, out of an immediate fear for his life and that he

26   had no prior violent offenses.  These two facts temper the view that petitioner displayed a "callous

27   disregard for human life" and contextualize the serious nature of the crime.  With respect to

28

                                                    8

1   petitioner's disciplinary violations, there is significant evidence in the record of petitioner's positive

2   institutional behavior, which reasonably mitigates the effect that petitioner's past violations have on

3   his suitability for parole.  Under the deferential AEDPA standard, the Superior Court's findings with

4   respect to the unsuitability factors were therefore not objectively unreasonable, and this court will

5   not disturb that court's conclusions.

6          The Superior Court concluded that some evidence supported the Governor's findings relating

7   to the suitability factors, but did not specify the evidence it relied upon in reaching that conclusion.

8   This court will therefore independently review the factual record in order to determine whether the

9   Superior Court's findings were objectively unreasonable.  See Greene v. Lambert, 288 F.3d 1081,

10  1088–89 (9th Cir. 2002).

11         As a threshold matter, petitioner argues that the state court's ruling was in error because all

12  the Governor's findings with respect to unsuitability factors were rejected.  According to petitioner,

13  evidence that a particular *suitability* factor does not apply cannot constitute evidence that petitioner

14  is *unsuitable* for parole.  In other words, petitioner argues that the absence of a factor indicating

15  suitability does not constitute some evidence of unsuitability for parole.

16         Petitioner reads the governing regulation too narrowly.  As the Superior Court noted,

17  subsection (b) of 2402 provides that "[a]ll relevant, reliable information available to the panel shall

18  be considered in determining suitability for parole."  The subsection further provides that the panel

19  may consider "any other information which bears on the prisoner's suitability for release."  Thus, the

20  Governor's findings under the suitability factors may properly be considered in denying parole

21  under the broad scope of subsection (b).  The court will now review the evidence supporting those

22  factors.

23         The Governor relied on only three facts in finding that petitioner did not meet the suitability

24  criteria for parole.  First, the Governor noted that petitioner fled the scene of the crime rather than

25  seeking medical assistance for the victims, demonstrating a lack of remorse.  Indeterminate Sentence

26  Parole Release Review, Pet.'s Exh. D at 2 ("After he was done shooting, rather than call for help for

27  those that he injured, he ran out of the restaurant . . . .").  Second, the Governor disapproved of the

28

**UNITED STATES DISTRICT COURT**
For the Northern District of California

1    Board's finding that petitioner committed the crime as a result of stress in his life.  Id.  ("The stress

2    that [petitioner] faced was . . . of his own making by continuing to deal drugs.").  Finally, the

3    Governor determined that petitioner's parole plans in Mexico, despite petitioner's INS hold, were

4    unrealistic.  Id. at 2–3 ("[A]lthough [petitioner] had previously been deported, he came back to the

5    United States illegally.  While he may have employment, family and residency in Mexico, he also

6    has two grown children here . . . .  If he is not deported, there is nothing in this record to indicate that

7    [petitioner] has viable parole plans here in the United States.").

8         With respect to the third of these findings, the court finds that the Governor's reasoning is

9    contrary to the regulation and to common sense.  Section 2402(d)(8) provides that a prisoner may be

10   suitable for release if "[t]he prisoner has made realistic plans for release or has developed

11   marketable skills that can be put to use upon release."  The subsection does not require that a

12   prisoner have viable parole plans *in the United States*.  Petitioner, as the Governor acknowledges,

13   has realistic parole plans in Mexico.  He has at least two job offers and a place to live.  When

14   Governor Davis reversed petitioner's grant of parole in 2003, petitioner had an INS hold and was

15   certain to be deported to Mexico upon release.  Respondent does not contend that petitioner's

16   immigration status has changed in any way.  The Governor's reasoning would require petitioner to

17   make plans to enter the United States illegally, and then communicate those illegal plans to the

18   Board in order to be granted a release date.  This argument is untenable, and the court therefore finds

19   the Superior Court's determination of this issue objectively unreasonable.

20        The Governor's reliance on the first two facts—petitioner's flight from the scene of the crime

21   without securing medical help and petitioner's involvement with drugs at the time he committed the

22   crime—presents a different problem.  Both of these facts date from at or before the time of the

23   crime.  Because petitioner cannot change the past, denying petitioner parole based only on the facts

24   surrounding the crime itself effectively changes his sentence from twenty years-to-life into life

25   imprisonment without the possibility of parole.

26        The Supreme Court has recognized that

27

28

                                          10

UNITED STATES DISTRICT COURT
For the Northern District of California

> [t]he requirements of due process vary with the private and governmental interests at stake and the circumstances of the alleged deprivation. . . . To insure that a state-created parole scheme serves the public interest purposes of rehabilitation and deterrence, the Parole Board must be cognizant not only of the factors required by state statute to be considered, but also the concepts embodied in the Constitution requiring due process of law.

Biggs, 334 F.3d at 916 (citing Morrissey v. Brewer, 408 U.S. 471, 481 (1972) and Greenholtz, 442 U.S. at 7–8). In Biggs, the Ninth Circuit applied the Supreme Court's language in Morrissey and Greenholtz when analyzing whether the denial of an inmate's parole violated his constitutional due process rights. The court recognized that in the context of denying an inmate parole, reliance "on an unchanging factor, [such as] the circumstance of the offense and conduct prior to imprisonment, runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation." Id. at 917. The petitioner in Biggs had been convicted of first-degree murder. Id. at 912. Although he had been a model inmate throughout his incarceration, a parole panel found him unsuitable for parole after he had served fourteen years of a twenty-five years-to-life sentence. Id. at 913. The panel based its decision in part on the gravity of the offense. The appellate court found that there was evidence to support this finding, but cautioned that over time, "should Biggs continue to demonstrate exemplary behavior and evidence of rehabilitation, denying him a parole date simply because of the nature of Biggs' offense and prior conduct would raise serious questions involving his liberty interest in parole." Id. at 916.

This case presents a stronger case for release than Biggs for several reasons. First, petitioner's commitment offense was less serious than the petitioner's in Biggs. The Biggs petitioner was involved in a violent, manipulative, and premeditated murder, while petitioner here acted impulsively and, at least in part, in response to the circumstances. See id. at 912. Second, the Biggs petitioner had not yet served the full terms of his sentence, while petitioner here has exceeded his sentence by approximately six years. Finally, unlike petitioner here, the petitioner in Biggs had not been granted parole by the original panel hearing his case. Petitioner here has "demonstrate[d] exemplary behavior and evidence of rehabilitation," as required by the Biggs court, for a significant

11

1    period of time.  Therefore, the sole reliance on petitioner's commitment offense in denying him

2    parole impinges on petitioner's constitutional liberty interest in parole.

3          The Eastern District of California has also considered the problem of continuing to rely on an

4    unchanging factor in denying an inmate a parole release date.  See Irons v. Warden of California

5    State Prison–Solano, 358 F. Supp. 2d 936, 947 (E.D. Cal. 2005).  The court in Irons noted that if

6    reliance on an unchanging factor were enough to constitute a valid denial of parole, petitioner would

7    have "no hope for ever obtaining parole except perhaps that a panel in the future will arbitrarily hold

8    that the circumstances were not that serious or the motive was more than trivial."  Id.  The petitioner

9    in Irons had been denied parole at his fifth parole hearing.  Id. at 939.  The petitioner had been

10   convicted of second-degree murder, and his fifth parole hearing occurred after he had served sixteen

11   years of a seventeen years-to-life sentence.  The court reversed the denial of parole, finding that the

12   Board had impermissibly relied on the commitment offense and petitioner's drug use at the time of

13   the offense, when petitioner had "continue[d] to demonstrate exemplary behavior and evidence of

14   rehabilitation."  Id. at 947 (citing Biggs).  Petitioner here presents facts more favorable to a finding

15   of suitability for parole than the petitioner in Irons.  He has surpassed his minimum sentence, and

16   has already been found suitable for parole by two decision-making bodies.

17         Applying the principles espoused in Irons and Biggs to this case, the court finds that there

18   was no evidence to support the Governor's reversal of petitioner's parole grant.  As the granting

19   Board found, petitioner has not had a significant disciplinary violation since 1995.  He has been in

20   prison for approximately twenty-six years and has taken advantage of numerous rehabilitation and

21   enrichment programs.  He has exceeded his minimum sentence by approximately six years.

22   Petitioner's supervisor at the Prison Industry Authority shoe factory documented that petitioner

23   demonstrates "exceptional teamwork, attitude, and cooperation with staff and co-workers," and that

24   petitioner is an "asset, not easily replaced on short notice, if not impossible."  After four panels

25   denied petitioner a release date, he was granted parole at his fifth hearing.  The Governor's sole

26   reliance on "the circumstance of the offense and conduct prior to the offense," Biggs, 334 F.3d at

27   917, constitutes a due process violation.  The court finds no evidence to support any of the

28

1  Governor's reasons for denying parole, and therefore finds that the Superior Court's denial of the

2  petition for habeas corpus was objectively unreasonable.

3  II.        The No-Parole Policy

4          The flimsy nature of the evidence underlying the Governor's denial of parole and the facile,

5  legally flawed argument with respect to petitioner's parole plans indicate another problem with the

6  denial of parole in this case.  As petitioner notes,[4] a recent decision from the United States District

7  Court for the Eastern District of California concluded that Governors Wilson and Davis operated

8  under a blanket no-parole policy for inmates serving sentences for murder.  Pet.'s Mem. Supp. Pet.

9  Writ of Habeas Corpus at 25–28 (citing Coleman, No. 96-0783 LKK PAN, slip op. at 9).  The

10  Coleman court's factual findings are equally applicable to the instant petition and may provide an

11  alternative reason behind Governor Davis's reversal of petitioner's parole grant.

12          Under Governors Wilson and Davis, the state "disregarded regulations ensuring fair

13  suitability hearings and instead operated under a sub rosa policy that all murderers be found

14  unsuitable for parole."  Coleman, 96-0783 LKK PAN, slip op. at 3.  Between 1992 and 1998, less

15  than one percent of prisoners serving murder terms were released on parole, while about four percent

16  had been released on parole during the previous period.  Id.  The petitioner in Coleman presented

17  testimony from former BPT Commissioners that the no-parole policy was enforced by

18  "(1) appointing Board members less likely to grant parole and more willing to disregard their

19  statutory duty; (2) removing Board members more likely to grant parole; (3) reviewing decisions

20  finding a prisoner suitable and setting a new hearing before a different panel; (4) scheduling

21  rescission hearings for prisoners who had been granted a parole date; (5) re-hearing favorable

22  rescission proceedings and hand-picking panels to ensure the desired outcome; (6) panel members

23  agreeing upon an outcome in advance of the hearing; and (7) gubernatorial reversal of favorable

24  parole decisions."  Id.

25          The no-parole policy for murderers was initiated by Governor Wilson and continued under

26  Governor Davis.  Id. at 4.  Davis was governor of California from 1999 until 2003, the date of the

27  petition in this case.  The California Supreme Court in In re Rosencrantz found that "the Board held

28

13

1   4800 parole suitability hearings between January 1999 through April 2001, granting parole to 48

2   murderers." Id. (citing In re Rosencrantz, 29 Cal. 4th at 685). However, of the 48 prisoners granted

3   parole, "the governor reversed 47 of the Board's decisions and only one murderer out of 4800

4   actually was released on parole." Id. The Coleman court noted evidence submitted by the petitioner

5   in In re Rosencrantz of an interview with Governor Davis in the April 9, 1999 edition of the Los

6   Angeles Times:

7           [T]he governor was adamant that he believes murderers—even those with second-
            degree convictions—should serve at least a life sentence in prison. Asked whether
8           extenuating circumstances should be a factor in murder sentences, the governor was
            blunt: 'No. Zero . . . . They must not have been listening when I was campaigning
9           . . . . If you take someone else's life, forget it. I just think people dismiss what I said
            in the campaign as either political hyperbole or something that I would back away
10          from . . . . We are doing exactly what we said we were going to do.'

11  Id. at 4–5 (internal quotation marks omitted) (citing In re Rosencrantz, 29 Cal. 4th at 684).

12          Based on the above facts, the Coleman court concluded that the denial of parole under the

13  governors' no-parole policy for murderers is per se invalid, because the petitioner in that case was

14  denied his constitutional right to be heard by an impartial decision-maker. See Withrow v. Larkin,

15  421 U.S. 35, 47 (1975) ("Not only is a biased decision-maker constitutionally unacceptable but 'our

16  system of law has always endeavored to prevent even the probability of unfairness.'" (quoting In re

17  Murchison, 349 U.S. 133, 136 (1955))). The Ninth Circuit has held that a California inmate is

18  "entitled to have his release date considered by a Board that [is] free from bias or prejudice."

19  O'Bremski v. Maas, 915 F.2d 418, 422 (9th Cir. 1990). Inmates are entitled to the same

20  constitutional safeguards when the Governor reviews parole decisions. See In re Rosenkrantz, 29

21  Cal. 4th at 660.

22          Here, Governor Davis's reasoning behind his reversal of petitioner's parole grant is thin to

23  the point of being pretextual. At best, the Governor gave petitioner's post-conviction

24  accomplishments cursory attention; the conclusion, however, appears to have been preordained. The

25  Governor's review of petitioner's case therefore did not comport with petitioner's constitutional

26  rights, and the court finds that the reasoning in Coleman further justifies a grant of relief in this case.

27

28

14

1
2
3
4    <u>CONCLUSION</u>
5          For the reasons set forth above, the petition for habeas corpus is GRANTED unless, within
6    60 days of this order, respondent provides a parole suitability hearing that comports with due
7    process.
8
9
10
11         IT IS SO ORDERED.
12
13   Dated: May 16, 2006
14                                                    _____
                                                      MARILYN HALL PATEL
15                                                    District Judge
                                                      United States District Court
                                                      Northern District of California
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT
For the Northern District of California

15

UNITED STATES DISTRICT COURT
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Endnotes**

1.      All references in this section are to the Petition for Writ of Habeas Corpus unless otherwise noted.

2.      After another parole suitability hearing on June 23, 2004, a subsequent Board, independently from the Governor, found petitioner unsuitable for parole.  Pet.'s Exh. M.  The result of that hearing is not at issue here.

3.      The court has found nothing in the record to support this contention except for Governor Davis's reliance on this fact in his decision to reverse the grant of parole.

4.      As respondent emphasized at the April 10, 2006 hearing, petitioner expressly declined to assert the Coleman court's factual findings as an alternative basis for granting the habeas petition. The purpose of the court's discussion of Coleman here is to provide a possible explanation for the reasoning behind the Governor's decision to reverse the grant of parole.